[No. S024958. Nov. 30, 1992.]

In re TROY Z., a Person Coming Under the Juvenile Court Law.
SAN DIEGO COUNTY DEPARTMENT OF SOCIAL SERVICES,
Plaintiff and Respondent, v.
SANDRA Z. et al., Defendants and Appellants.

**COUNSEL**

Robert D. Frank and Barbara A. Smith, under appointments by the Supreme Court, for Defendants and Appellants.

Lloyd M. Harmon, Jr., County Counsel, Susan Strom, Chief Deputy County Counsel, Patricia L. Davis, Gary C. Seiser and John E. Phillips, Deputy County Counsel, for Plaintiff and Respondent.

Steven M. Woodside, County Counsel (Santa Clara), Diane L. Bennett, Deputy County Counsel, Jennings, Engstrand & Hendrikson, Debra K. Maurer and Kelly R. Waggonner as Amici Curiae on behalf of Plaintiff and Respondent.

Carol Archer, under appointment by the Supreme Court, for Minor.

**OPINION**

LUCAS, C. J.—We granted review to decide (i) whether parents who plead "no contest" to a petition alleging their child falls within the jurisdiction of the juvenile court under Welfare and Institutions Code section 300, subdivision (e),[1] may subsequently assert on appeal that their conduct does not in fact fall within that section; and, if so, (ii) whether the act of starving a child to near death constitutes "severe physical abuse" as that term is defined in

---

[1] Hereafter section 300, subdivision (e), or section 300(e). Further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

section 300(e). We conclude the parents' claim is not cognizable on appeal, and thus decline to address the statutory interpretation issue.[2]

## I. *Facts, Procedure, and Relevant Statutes*

In the late afternoon of May 17, 1989, Sandra Z. noticed that the eyes of her six-month-old son, Troy, were rolled back. She telephoned from a neighbor's home for emergency help. When paramedics arrived, Troy was not breathing. They transported him to the hospital, where the admitting doctors found him to have "no palpable blood pressure" and a body temperature of 89 degrees axillary. He was "flaccid," and appeared "severely emaciated and foul-smelling."

Sandra and John Z. (Troy's father) explained to social workers that since his third month (when they stopped feeding Troy expensive baby formula in favor of "boiled milk" and "all kinds of other food"), Troy frequently sucked his fingers into his throat, making himself gag and vomit. They revealed that Troy had received no medical care—even though John was in the Navy and entitled to such care for his family, and despite the fact that neighbors had advised them to seek such help—because, in John's words, the hospital's "policy on appointments is always different" and "I won't wait in line."

Another doctor who examined Troy hours after admission found he displayed "profound emaciation." Troy weighed only seven pounds, five ounces—eight ounces less than his birth weight. His length was below average for his age, all of his ribs were visible, no subcutaneous fat was present, and "his overall appearance was that of a starved infant"—a characterization graphically substantiated by photographs taken the day after admission, and made part of the record on appeal.

After a week, Troy gained on average more than three ounces a day, with no vomiting or sign of illness. His physician concluded: "[I]t seems definite that Troy has no illness that would cause him to become undernourished and that his nutritional problem which almost killed him was, with reasonable medical probability, due simply to his being deprived of sufficient feedings by his caretakers. This in turn, indicates a profound degree of unconcern and indifference to his needs on their part. His return to such an environment and such caretakers would be extremely hazardous. In all probability, the situation would simply repeat itself. There is no known method of producing

---

[2]We note that while this case was pending before us, section 300(e) was "expanded" to define "severe physical abuse" as, inter alia, "willful, prolonged failure to provide adequate food." (Stats. 1992, ch. 382, Leg. Counsel's Digest, pt. (1), No. 8 West's Cal. Legis. Service, p. 1230.)

necessary change in persons who have starved babies virtually to death." The physician also predicted that "permanent developmental delay" was "not unlikely" in view of Troy's "profound undernutrition."

The hospital staff placed a protective hold on Troy, and notified the San Diego County Department of Social Services (DSS) and the police.[3] DSS filed an amended petition in juvenile court under section 300, subdivisions (a), (b) and (e), seeking to have Troy declared a dependent child within the jurisdiction of the juvenile court.

Section 300, subdivision (a), provides for a finding of jurisdiction when "[t]he minor has suffered . . . serious physical harm inflicted nonaccidentally upon the minor by the minor's parent . . . ." Subdivision (b) provides for a finding of jurisdiction when "[t]he minor has suffered . . . serious physical harm or illness . . . by the willful or negligent failure of the parent . . . to provide the minor with adequate food, clothing, shelter, or medical treatment . . . ." "Reunification services"—i.e., court-ordered social counselling and treatment services designed to facilitate reunification of the family within 12 to 18 months—are mandatory under either subdivision. (§ 361.5, subd. (a).)

As noted, the petition also asserted section 300(e) as a basis for jurisdiction. That subdivision provides for a finding of jurisdiction when "[t]he minor is under the age of five and has suffered severe physical abuse by a parent . . . ." At the time of the events in this case (see *ante*, p. 1173, fn. 2), it further provided that "[f]or the purposes of this subdivision, 'severe physical abuse' means any of the following: any single act of abuse which causes physical trauma of sufficient severity that, if left untreated, would cause permanent physical disfigurement, permanent physical disability, or death; . . . or more than one act of physical abuse, each of which causes bleeding, deep bruising, significant external and internal swelling, bone fracture, or unconsciousness."

Whereas reunification services are mandatory when a child is declared to be within the jurisdiction of the court under section 300, subdivisions (a) or (b), there is a presumption against provision of reunification services if jurisdiction is based on section 300(e). If jurisdiction is based on subdivision (e), the court is directed *not* to provide reunification services unless the court finds that such services "are likely to prevent reabuse or continued neglect of the child or that failure to try reunification will be detrimental to the child because the child is closely and positively attached to that parent." (§ 361.5,

---

[3]As explained below, a month later both parents were arrested on felony child abuse charges.

subd. (c), 2d par.) ■ This latter provision reflects the Legislature's recognition that the "cost" of a reunification attempt (i.e., a minor's life is suspended in uncertainty for 12 to 18 months) is unjustified in those cases involving severe physical abuse, and in which the likelihood of reabuse is substantial. (Cf., *Adoption of Alexander S.* (1988) 44 Cal.3d 857, 868 [245 Cal.Rptr. 1, 750 P.2d 778] [" 'It is undisputed that children require secure, stable, long-term, continuous relationships with their parents or foster parents. There is little that can be as detrimental to a child's sound development as uncertainty over whether he is to remain in his current "home," under the care of his parents or foster parents, especially when such uncertainty is prolonged.' "].)

Within a month after Troy's admission to the hospital, both of his parents were arrested on felony child abuse charges. They were released from jail after about two weeks, but prohibited by court order from contacting Troy, who had been placed in long-term confidential licensed foster care.

### 1. *The Jurisdiction Hearing*

A jurisdiction hearing under section 300 was held in July 1989. Both parents appeared with their respective counsel, who informed the court their clients wished to plead "no contest" (Cal. Rules of Court, rule 1449(e)) to the section 300 allegations. The court proceeded to explain to the parents the various rights they would waive by pleading no contest to the allegations. At that point the deputy district attorney (representing DSS) interjected:

"Excuse me, . . . I'm wondering if the court would like to advise that the law presumes that if the court finds by clear and convincing evidence at a dispositional hearing that the parent[s'] activities brought the child within the meaning of section 300(e), the law would presume that there would be no reunification between them and their child; however, they would have the ability at that hearing to show that reunification with the child might be in the child's best interest, and if so ordered, then they would have to follow the orders of the court. [¶] However, if a court at a dispositional hearing did not find it was in the best interest of the child that reunification efforts be had, that the court at that hearing would order that a hearing occur within 120 days which could result in the[] parent[s'] rights to the child being terminated."

The court commented that "[t]he district attorney has taken it one step further than where we are today, and that is, what are the consequences of your entering a plea." The court asked the parents' respective counsel whether they had "an opportunity to discuss the consequences with respect

to disposition with your clients?" Both counsel answered, "That is correct." The court then stated: "Parents have heard the explanation of the district attorney with respect to the fact that there is an allegation under [section] 300(e), . . . which is your willfully having done acts which led to the medical condition . . . ." The court stated it understood the parents "intend to put on evidence with respect to that but . . . it [will be] your job to . . . convince the court that it is in the child's best interest that reunification services be offered to you. [¶] You understand the process and the possibility that exists particularly with respect to the [section] 300(e) allegation?" Both parents answered affirmatively. The court concluded: "Having all of that in mind, including the representations made and the discussions made by the district attorney and the discussion with respect to that, you still wish to enter a plea of no contest?" Both parents again replied affirmatively. The court then found that "each parent understands the nature of the conduct alleged in the petition and the possible consequences." It found the reports of the admitting doctors established "a factual basis for the plea and the allegations of the petition" (Cal. Rules of Court, rule 1449(f)(6)) and found each allegation to be "true as alleged by clear and convincing evidence. The minor is a person described under subdivisions (a), (b) and (e) of section 300 . . . ." (§ 356.) The court set a "disposition hearing" for August 1989.

## 2. The Disposition Hearing

The focus of the disposition hearing was on whether reunification services should be provided to the parents. After hearing testimony by three witnesses,[4] the court heard closing arguments and announced its disposition. It declared Troy to be a dependent child of the court under section 300,

---

[4]Dr. Clark, a psychologist who had treated parents involved in similar cases, testified that under optimal circumstances—i.e., assuming a favorable outcome in the parallel criminal prosecution, and assuming the parents "in fact would avail themselves of the opportunity . . . and that those services were competent"—there was at most a 60 percent chance that reunification services would be successful, allowing the parents to regain custody of Troy. Later he characterized the probability of success as "a toss-up." Dr. Clark admitted he was concerned about whether the parents would in fact "fully utilize" whatever reunification services might be made available to them. Finally, he testified that based on his evaluation, neither parent had a "close personal relationship" with Troy, and that Troy probably would not suffer "serious emotional detriment" if he were separated from them.

Dr. Chadwick, Director of the Center of Child Protection at Children's Hospital in San Diego, and one of the physicians who examined Troy shortly after he was admitted to the hospital, testified Troy suffered from an "extreme" case of "nonorganic failure to thrive," and that he "came within a hairsbrea[d]th of dying of starvation." Dr. Chadwick stated that two photographs of Troy taken the day after admission to the hospital fairly and accurately depicted Troy's condition on admission, and he verified that six additional photographs, taken the day before his testimony, accurately reflected Troy's condition three months after admis-

subdivisions (a), (b) and (e) (see § 360, subd. (c)), and, finding there was a "substantial danger to the physical health of the minor" if he were returned home, the court removed Troy from his parents' custody and control under section 361, subdivision (b)(1). Pursuant to section 361.5, subdivision (b)(5), the court found by clear and convincing evidence that "the actions of each parent . . . brought this matter under the jurisdiction of the court pursuant to section 300(e)."[5] The court then proceeded in accord with section 361.5, subdivision (c), second paragraph. As noted above, that section provides that in cases such as this one reunification services should *not* be provided unless "competent testimony" supports a finding that (i) such services "are likely to prevent reabuse or continued neglect of the child," or (ii) "failure to try reunification will be detrimental to the child because the child is closely and positively attached to the parent." (§ 361.5, subd. (c), 2d par.)

The court addressed and summarily rejected the second alternative condition, noting that the parents' counsel had not even attempted to argue that Troy had become attached to his parents. It then considered whether reunification services were "likely to prevent reabuse or continued neglect" of Troy.[6]

The court found parents had continuous access to various social services through the Navy, and yet failed to use those services, or take Troy to the hospital, even though he had grown severely emaciated. The court summarized the experts' predictions concerning the potential for successful reunification services, and concluded the evidence disclosed no "likelihood that [the parents'] mind-set, given all the factors considered, can be changed by any services." The court expressed the opinion that because the parents had not demonstrated any recognition of or willingness to deal with their problems, compelled reunification services would "not likely . . . prevent reabuse or continued neglect of [Troy] by either of his parents" and, accordingly, declined to order reunification services. Pursuant to section 361.5,

sion—he weighed 20 pounds and was "close to normal" in development. Finally, Dr. Chadwick testified that in his opinion, "to try to proceed with a reunification plan is risky in the extreme" in light of the severity of the case.

Mr. Gardner, a social worker, testified that in his 20 years' experience he had never seen a "failure to thrive" case as severe as this one, and recommended against attempting to provide reunification services in this case because, inter alia, (i) he felt there was merely a 30 percent chance of successful reunification, (ii) he believed "the parents have not grasped the point of their responsibility," and (iii) research articles suggest that in such cases "when a child is reunited . . . the prognosis turns out to be quite poor in the best of situations."

[5]The court added that it also made that finding "beyond a reasonable doubt."

[6]In making this determination the court was directed to consider, inter alia, (1) "[t]he failure of the parent to respond to previous services," and (2) "testimony by a competent professional that the parent's behavior is unlikely to be changed by services." (§ 361.5, subd. (c), 3d par.)

subdivision (f), the court set a hearing under section 366.26 for December 1989, to select and implement a long-term plan for Troy, and ordered DSS to prepare an adoption assessment report (§ 361.5, subd. (g)). Two weeks later John Z. filed a notice of appeal from the foregoing disposition order, asserting insufficiency of evidence and abuse of discretion. (No. D010733.) Sandra Z. later joined in that appeal.

Thereafter the parents became homeless, and began living in various shelters; Sandra Z. gave birth to an ill baby that tested positive for traces of cocaine; and both parents pleaded guilty to felony child abuse charges.

### 3. *Motions to Withdraw No Contest Pleas*

Shortly before the December "selection and implementation" hearing, described below, both parents filed motions to withdraw their no contest pleas insofar as those pleas conceded the court's jurisdiction over Troy under section 300(e).[7] The motions asserted the parents (and their counsel) had "inadvertently misunderstood the meaning and intent" of that section when the plea was entered, and that this constituted "mistake, inadvertence, surprise or excusable neglect" (Code Civ. Proc., § 473) warranting withdrawal of the no contest pleas. Counsel for DSS and court appointed counsel for Troy opposed the motions.

At a hearing on the parents' motions, counsel for John Z. asserted, "[t]he thrust of the . . . motion . . . is that there was a mistake of law and that the facts of this case do not support jurisdiction under section 300(e)." Counsel for DSS pointed out that at the time the pleas were taken both parents were advised about the consequences of their pleas to section 300(e), and he expressed his view that off-the-record, in camera discussions at that time revealed "that it was a tactical decision to enter the plea as to jurisdiction and to proceed to a contested dispositional hearing." At that point, counsel for Sandra Z. stated she agreed with that assessment: "My recollection of the no-contest effort [is that it] was entered into [as] a strategic exercise." Counsel for Troy concurred with that assessment.

The court remarked that it similarly recalled that "tactical considerations" motivated the no contest pleas, and it also recalled the extensive discussion that took place concerning the consequences of the plea to section 300(e). In addition, the court reaffirmed its view that "the facts as presented in this case clearly allege, in this court's mind, a cause of action under Welfare and Institutions Code, section 300(e)." Accordingly, the court found no mistake

---

[7]The parents expressly declined to contest the propriety of the jurisdiction findings under section 300, subdivisions (a) and (b).

of law, and no other ground for withdrawal of the no contest pleas, and denied the parents' motions.

### 4.  *The Selection and Implementation Hearing*

The court proceeded to the section 366.26 "selection and implementation" hearing.[8] After considering testimony from the parents and social workers (and a social worker's report and separate "adoption assessment report"), the court found, pursuant to section 366.26, subdivision (c)(1), that it was "likely" the minor will be adopted, and that its previous finding pursuant to section 361.5, subdivision (b) (that reunification services should not be offered to the parents) constituted a sufficient basis for termination of parental rights (see § 366.26, subd. (c)(1)). The court additionally found that termination would not be detrimental to Troy under section 366.26, subdivision (c)(1)(A)-(D). Finally, the court found, under section 366.26, subdivision (g), that adoption is in Troy's best interests. Accordingly, "by clear and convincing evidence," the court terminated Sandra and John Z.'s parental rights to their son Troy, selected a permanent plan of adoption (*id.*, subd. (b)(1)), and referred Troy to DSS for adoptive placement (*id.*, subd. (i)).

Both parents filed notices of appeal (No. D011549), claiming, inter alia, that insufficient evidence supported the termination order, and that termination should not have been based on the court's earlier section 300(e) finding, because that finding was itself erroneous and the subject of a pending appeal in case No. D010733.

The Court of Appeal consolidated the two appeals. It concluded that starvation of an infant to near death does not constitute "severe physical abuse" under section 300(e), and hence it reversed the disposition order in No. D010733 "to the extent the jurisdictional finding was based on section 300, subdivision (e)," and instructed the trial court to offer reunification services pursuant to section 361.5, subdivision (a). Accordingly, the court also reversed the judgment terminating parental rights (No. D011549).

## II.  *Analysis*

We begin with an issue briefed by DSS and both parents in the Court of Appeal, but ignored by that court, namely, whether the parents may

---

[8]Under that section, the court is required to select a long-term plan for the minor from among four options, which range from permanently severing parental rights to placing the minor in long-term foster care. (§ 366.26, subd. (b) (1)-(4).) Return of the minor to the parents is *not* an available option.

contest the applicability of section 300(e), after they pleaded "no contest" to that allegation at the jurisdiction hearing. We conclude they may not do so.[9]

We find persuasive an analogous line of cases establishing that when a defendant in a criminal proceeding pleads "guilty" or "nolo contendere," he may not challenge on appeal his "guilt or innocence." Instead, such a claim is not cognizable on appeal.

In *People* v. *Pinon* (1979) 96 Cal.App.3d 904 [158 Cal.Rptr. 425], the defendant pleaded guilty to a charge under Penal Code section 12021, which makes illegal the possession of a firearm by "[a]ny person who has been convicted of a felony . . . ." The defendant asserted on appeal that his conviction cannot stand because the crucial "felony" element was in fact not present; he claimed his prior conviction "was in fact a misdemeanor conviction and that his trial counsel was constitutionally inadequate for not recognizing that fact." (*Id.*, at p. 909.) In rejecting the attempt to raise this issue on appeal, the appellate court, in an opinion by Justice Kaus, first noted that the defendant had failed to secure a certificate of probable cause (Pen. Code, § 1237.5), but then went on to explain the "more fundamental reason why these issues may not be raised on appeal: since they go to the question of guilt or innocence, they have been 'removed from consideration' by the guilty plea. (See *People* v. *DeVaughn* (1977) 18 Cal.3d 889, 895-896 [135 Cal.Rptr. 786, 558 P.2d 872].)" (*Pinon, supra*, 96 Cal.App.3d at pp. 909-910.)

The *Pinon* court, quoting *People* v. *DeVaughn* (1977) 18 Cal.3d 889, 895 [135 Cal.Rptr. 786, 558 P.2d 872], continued: " 'Issues cognizable on appeal following a guilty plea are limited to issues based on "reasonable constitutional, jurisdictional,[10] or other grounds going to the legality of the proceedings resulting in the plea. [Citations.]" ' " (*Pinon, supra*, 96 Cal.App.3d at p. 910.) The court explained, "The issues presently sought to be raised do not attack the proceedings resulting in the plea. Rather, defendant's contention that the prior conviction was a misdemeanor rather than a felony, and the related contention that counsel was incompetent, go solely and directly to

[9]The parents did not assert in the Court of Appeal that the trial court abused its discretion in denying their motion to set aside their no contest pleas. We reject John Z.'s assertion that the trial court's denial of their motion to withdraw, by itself, automatically rendered the issue of the application of section 300(e) appealable under section 395. (The latter section allows appeal from "any subsequent order" following an order after judgment.)

[10]No issue is raised in this case concerning the "jurisdictional . . . legality of the proceedings," as that phrase is used in *Pinon, supra*, 96 Cal.App.3d 904, and *DeVaughn, supra*, 18 Cal.3d 889. The parents do not fall within the exception merely because they now seek to challenge the court's finding at the "jurisdictional hearing" that the minor falls within the statutory "jurisdiction" of the family court.

the question whether he was in fact guilty of the charged offense. However, his plea of guilty 'operated to remove such issues from consideration as a plea of guilty admits all matters essential to the conviction.' [(*DeVaughn, supra,* 18 Cal.3d at p. 895.)] *Consequently, these issues are simply not cognizable on the present appeal . . . ." (Pinon, supra,* 96 Cal.App.3d at p. 910, italics added; accord, *People* v. *LaJocies* (1981) 119 Cal.App.3d 947, 956-957 [174 Cal.Rptr. 100] [following *Pinon* and *DeVaughn;* guilty plea waives constitutional challenge to prior conviction]; *People* v. *Perry* (1984) 162 Cal.App.3d 1147, 1152 [209 Cal.Rptr. 414] [following *Pinon* and *DeVaughn;* guilty plea waives claim based on sufficiency of evidence]; see generally 6 Witkin & Epstein, Cal. Criminal Procedure (2d ed. 1989) Appeal, § 3141, p. 3881 et seq.)

The same rule applies after a defendant enters a plea of "nolo contendere" ("no contest"). (*People* v. *Shults* (1984) 151 Cal.App.3d 714, 718-720 [199 Cal.Rptr. 33] [following *Pinon* and *DeVaughn;* nolo contendere plea waives appellate review of *in limine* ruling by trial court barring evidence supporting claim of collateral estoppel].) " 'In short, a defendant "cannot admit the sufficiency of the evidence by pleading guilty [or nolo contendere] and then question the evidence by an appeal . . . ." ' " (*Id.,* at p. 719; see also *People* v. *Duval* (1990) 221 Cal.App.3d 1105, 1114 [271 Cal.Rptr. 240]; *People* v. *Arwood* (1985) 165 Cal.App.3d 167, 171 [211 Cal.Rptr. 307]; *People* v. *Haven* (1980) 107 Cal.App.3d 983, 985 [167 Cal.Rptr. 376].)

We discern no reason why these principles should not apply here as well. A plea of "no contest" or an "admission" (Cal. Rules of Court, rule 1449(e)) is the juvenile court equivalent of a plea of "nolo contendere" or "guilty" in criminal courts. A plea of "no contest" to allegations under section 300 at a jurisdiction hearing admits all matters essential to the court's jurisdiction over the minor. Accordingly, by their knowing and voluntary acquiescence to the allegations of the petition, parents waived their right to challenge on appeal the legal applicability of section 300(e) to their conduct.[11] (Cf. Cal. Rules of Court, rule 1435(d) [concerning advice of appeal rights after "contested hearing"]; 9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, § 143, pp. 152-153, and cases cited [In civil cases, "[a] judgment rendered with consent of the appellant is not appealable."].) ▆▆▆ ▆ ▆ Any other conclusion—i.e., allowing a parent to challenge jurisdiction findings on appeal after entering a valid no contest plea to those findings, and after the parties proceeded under the assumption that reunification services would *not*

---

[11]Lest there be any confusion, we expressly reject the parents' assertion that the alleged legal inapplicability of section 300(e) to their conduct somehow renders their claims cognizable on appeal following their no contest pleas. As explained above, an essentially identical argument was raised, and properly rejected, in *Pinon, supra,* 96 Cal.App.3d 904.

be offered—would not only violate the principles articulated in *Pinon, supra,* 96 Cal.App.3d 904, and *DeVaughn, supra,* 18 Cal.3d 899, but also frustrate the clear purpose of the statutory scheme, which quite plainly contemplates expedited placement of those children for whom reunification is unlikely to prevent reabuse. (See, e.g., *Adoption of Alexander S., supra,* 44 Cal.3d 857, 868.)[12]

## III. *Conclusion*

Because the parents' claim regarding the scope of section 300(e) is not cognizable on this appeal, we reverse the judgment of the Court of Appeal.[13]

Mosk, J., Panelli, J., Kennard, J., Arabian, J., Baxter, J., and George, J., concurred.

---

[12]John Z. attacks the judgment on the additional ground that he was denied effective assistance of counsel at the jurisdiction hearing because counsel permitted him to plead no contest to the section 300(e) allegations. Assuming arguendo that such a claim is cognizable in these circumstances, and that a parent may attack a disposition order on this ground (but see *In re Malinda S.* (1990) 51 Cal.3d 368, 384 [272 Cal.Rptr. 787, 795 P.2d 1244], quoting *In re Mary S.* (1986) 186 Cal.App.3d 414, 418-419 [230 Cal.Rptr. 726] [" 'Nor can the parent seek reversal on grounds of incompetency of counsel.' "]), this claim is nonetheless meritless. As noted above, both parents were under arrest and facing possible felony charges relating to these events at the time they entered their no contest pleas at the jurisdiction hearing. Furthermore, as noted above, counsel and the court agreed that "tactical" and "strategic" considerations motivated the pleas. Under these circumstances, counsel for John Z. might have believed that a no contest plea to the jurisdiction allegations might assist John Z. in his criminal case. Accordingly, because the record does not affirmatively disclose that counsel had no rational tactical purpose supporting John Z.'s no contest pleas to section 300(e), we have no basis on which to conclude that counsel performed unreasonably.

[13]Having reached this conclusion, we deny as moot DSS's July 9, 1992, motion to strike references in John Z.'s brief to information contained in his criminal file.